IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

ALLIANCE HEALTHCARE SYSTEMS, INC.,                    PLAINTIFFS
WILLIAMS MEDICAL CLINIC,
N-KREDIBLE FRANCHISE COMPANY, LLC,
FRENCH QUARTER GROUP, LLC, AND
KENNETH WILLIAMS, M.D.

VS.                                          CIVIL ACTION NO. 3:15CV181-NBB-JMV

FIRST TENNESSEE BANK NATIONAL
ASSOCIATION and/or FIRST HORIZON                       DEFENDANT
NATIONAL CORPORATION

## C O M P L A I N T
### JURY TRIAL DEMANDED

COME NOW the Plaintiffs, Alliance Healthcare Systems, Inc., Williams Medical Clinic

and Kenneth Williams, M.D., and file this civil action against the Defendant, First Tennessee Bank

National Association ("Bank") and in support thereof would show unto the Court the following:

### PARTIES

1.      Alliance Healthcare Systems, Inc., is a foreign corporation organized and existing

by virtue of the laws of the State of Delaware whose principal place of business is located at 1430

Mississippi 4, Holly Springs, Mississippi 38635.

2.      Williams Medical Clinic was a domestic corporation but currently operates under

the umbrella of Alliance Healthcare Systems, Inc. whose principal place of business is located at

1938 Crescent Meadows Drive, Holly Springs, Mississippi 38635.

3.      Kenneth Williams, M.D., is an adult resident citizen of Shelby County, Tennessee,

whose residence address is 4738 Mallard Lake Cove, Collierville, Tennessee 38107.

4.      N-Kredible Franchise Company, LLC, is a domestic limited liability company whose principal place of business is 1938 Crescent Meadows Drive, Holly Springs, Mississippi 38635.

5.      French Quarter Group is a domestic limited liability company whose principal place of business is located at 1938 Crescent Meadows Drive, Holly Springs, MS 38635.

6.      First Tennessee Bank National Association and/or First Horizon National Corporation is/are a foreign corporation organized and existing by virtue of the laws of the State of Tennessee upon whom service of process may be had by serving its registered agent for service of process, C.T. Corporation System, located at 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

<u>JURISDICTION</u>

7.      This Court has jurisdiction of this matter pursuant to the relationship of the parties being established in Mississippi and the property at issue is in the State of Mississippi.

<u>FACTUAL ALLEGATIONS</u>

8.      First Tennessee Bank National Association (hereinafter referred to as First Tennessee Bank) has exceeded the interest rates allowable by law, overcharged in fees and services, failed to properly disclose amortization schedules and principal applied to payments, and breached its fiduciary duties.

9.      This lawsuit is brought to protect the Plaintiffs, Dr. Kenneth Williams (hereinafter referred to as Dr. Williams), N-Kredible Franchise Company, LLC (hereinafter referred to as N-Kredible), French Quarter Group, LLC (hereinafter referred to as French Quarter), and Alliance Healthcare Systems, Inc. (hereinafter referred to as Alliance Healthcare) from a breach of non-disclosure and fiduciary duties by First Tennessee Bank.

10.     Dr. Williams is a reputable medical doctor practicing in Holly Springs, Mississippi.

11.     Dr. Williams began practicing medicine in 1986 in Tennessee and Michigan; he began his career in Mississippi in 1989.

12.     Dr. Williams' bank account with First Tennessee Bank for Williams Medical Clinic in Holly Springs was first opened in 1992.

13.     In November 1999, Dr. Williams and Alliance Healthcare opened a second bank account with First Tennessee Bank when they purchased Holly Springs Hospital.

14.     With the opening of this second account, First Tennessee Bank assigned Alliance Healthcare to a Senior Vice-President of Commercial Lending as contact person.

15.     From January 2001 to December 2005, Dr. Williams led the Holly Springs Hospital out of red and into black for the first time in twenty years; at the time of purchase, Holly Springs Hospital was losing $60,000 a month.  Group revenues went from $6 million to $8.6 million in 2005.

16.     Beginning in 1992, Dr. Williams often received loans from First Tennessee Bank for various projects.  Selected by SBA as MS Small Businessman of the year in 2007.

17.     A course of dealing and mutual understanding developed between Dr. Williams and First Tennessee Bank over this extended period.

18.     In January of 2006, Dr. Williams signed a $850,000 loan for N-Kredible Franchise Company through First Tennessee Bank.

19.     In August of 2006, Dr. Williams signed a $47,940 ambulance loan through First Tennessee Bank.

20.     Despite the fact that the hospital encountered some difficulties along the way, Dr. Williams was never in default on a loan through First Tennessee Bank.

21.     On 2 March 2007, Dr. Williams signed a $3,000,000.00 construction loan agreement for the construction of a new clinic through First Tennessee Bank.

22.     In February of 2008, Dr. Williams signed a $250,000 line of credit through First Tennessee Bank.

23.     Dr. Williams originally agreed to pay a floating rate on the $3,000,000 construction loan from First Tennessee, but bank personnel advised him to enter into an Interest Swap Agreement (swap).

24.     First Tennessee told Dr. Williams that the swap was a safe investment that would save him money by reducing Dr. William's interest costs.

25.     Based on First Tennessee's alleged assurances to Dr. Williams, he entered the swap, knowing that within 45 days of construction a permanent loan was required.

26.     The swap was supposed to have guaranteed Dr. Williams a floating interest rate. Instead, Dr. Williams paid First Tennessee a fixed interest rate of 7.85% instead of 2.65% floating rate from April 2008 until April of 2014.

27.     The interest rate Dr. Williams assumed in the swap was 196% greater than the floating rate from which First Tennessee represented the swap would protect Dr. Williams.

28.     In the 6 years the swap was active, Dr. Williams ended up paying over $1,000,000 in interest it would have otherwise avoided under the terms of the original promissory note.

29.     First Tennessee actively bet against Dr. Williams while at the same time luring him to agree to the swap with promises of safety and cost-savings.

30.     First Tennessee's assurances of a favorable outcome for Dr. Williams would preclude the possibility that Dr. Williams was properly advised about the risks of the swap.

31.     Where First Tennessee informed him that the swap was just a way for Dr. Williams to lock in a lower monthly payment, the swap ended up being a series of 72 highly speculative monthly bets, all of which Dr. Williams lost.

32.     His banker highlighted the final proposal as up to $3,000,000.00 (85% of appraised value) with the rate during construction at First Tennessee Bank's base rate minus .75%.

33.     The rate could be fixed at closing for the permanent loan at 7.86% (subject to change with market conditions) at a fixed rate for ten years (twenty-year amortization at payments approximately $25,000 per month).

34.     In October 2008, an additional $760,000.00 construction loan was given to Dr. Williams by First Tennessee Bank in order to finalize clinic construction.

35.     Construction of the clinic was completed and Williams Medical Clinic opened in Holly Springs, Mississippi in October 2008.

36.     In May 2008 following the departure of his longtime contact from First Tennessee Bank, Dr. Williams' accounts were placed under the advisement of Robert "Bob" Naber (hereinafter referred to as Naber).

37.     In December 2009, Dr. Williams' accounts were assigned to the special assets/loan rehabilitation division of First Tennessee Bank.

38.     It was never explained to Dr. Williams that the special assets/loan rehabilitation division of the bank was essentially a form of "purgatory", but instead was pitched to him as a temporary way to reset his loans.

39.     If Dr. William's loan assets were impaired enough to warrant the adverse credit classification that loan rehab and forbearance suggest, then Dr. Williams should not have been able to cover such material increases in debt-related costs.

40.     From this point on, First Tennessee Bank had complete control of Dr. Williams loans and the payments made on them from his accounts.

41.     Dr. Williams was forced into a forbearance agreement by First Tennessee in January 2010.

42.     First Tennessee claimed that Dr. Williams' alleged failure to make certain payments of principal and interest and to remit certain federal and/or state payroll and/or other tax payments provided evidence of default that gave rise to the forbearance.

43.     The alleged failure to make certain payments of principal and interest was the result of a misunderstanding arising from a meeting between Dr. Williams and First Tennessee representative in November 2009. As a result, Dr. Williams withheld the December 2009 payment, which, along with the January 2010 payment, was made on January 12, 2010 in compliance with the forbearance agreement.

44.     The failure to remit certain federal and/or state payroll and/or other tax payments is an issue that occurred in 2006. This would predate the forbearance agreement by at least 3 years, and would have been known by First Tennessee for multiple years prior to the origination of the Medland construction loan ($3,000,000), the Medland extension loan ($760,000), the Alliance line of credit ($250,000) and the Alliance term loan ($350,000).

45.     This agreement and contract were presented to Dr. Williams by Anita Black of First Tennessee Bank over the course of several meetings in Holly Springs, Mississippi.

46.     According to Anita Black's LinkedIn profile, her employment with First Tennessee ended in 2000.

47.     Ms. Black's LinkedIn profile also states that since 2006 she has been the Managing Partner of a debt management company called "Primacy Solutions, LLC."

48.     The profile describes Primacy Solutions as "Specializing in representing banks and business owners of distressed business in turnarounds, her experience is in identifying and implementing win-win debt repayment strategies."

49.     It is true that if Anita Black did not work directly for First Tennessee during this time then First Tennessee would not have properly overseen Ms. Black's activities as is required by the OCC for banks in the United States that outsource services.

50.     If Ms. Black was an independent contractor, and oversight was insufficient, the inconsistency between the performances of Dr. Williams' loans, and the indefinite nature of the forbearance period may be found in Ms. Black's financial incentives.

51.     Suppose Ms. Black is only paid as long as Dr. Williams' loans are in forbearance, then Ms. Black has the financial incentive to keep Alliance in forbearance for an indefinite period.

52.     First Tennessee Bank presented the forbearance agreement to Dr. Williams as a way to "get back on his feet" until his financial situation improved and his reporting was brought up to speed.

53.     Dr. Williams' financial issues under question by First Tennessee Bank were due to the loss of their current accountant and unfiled paperwork due to this circumstance; regardless, his financials were updated quarterly and he should have never been placed under a forbearance agreement.

54.  Out of 185 payments for multiple loans from 2005 to 2009, Dr. Williams was late for only four payments, all of which were paid within thirty days.

55.  After any payment was made late Dr. Williams always doubled up on the following payment.

56.  First Tennessee Bank never alleged these four late payments were a cause for assigning Dr. Williams to a rehabilitation program and forbearance agreements.

57.  A forbearance agreement is used by banks for the purpose of rehabilitating a customer for a period of time until the customer's cash flow may match up to the terms of their loans under the condition that the lender will not exercise its legal right to foreclosure.

58.  Forbearance is not a long-term solution for delinquent borrowers, but designed for customers experiencing unforeseen financial problems.

59.  In the case of Dr. Williams and Alliance Healthcare, $3.6 million out of the $4.9 million borrowed from First Tennessee Bank was never accounted for following the forbearance agreement.

60.  First Tennessee Bank never provided Williams with renegotiated interest rates or an amortization schedule for where his payments would be applied under the forbearance agreement.

61.  Weekly debt payments from pre-forbearance to the 2nd Amendment of the forbearance agreement increased by 29%. From the 2nd Amendment to the forbearance agreement to the 6th Amendment, required weekly debt payments increased 112% from $16,500 to $35,000. The adjustment from $71,500 per month to $151,666.67 per month, compared to $33,000 approximately, what should have been charged.

62.     In July of 2010, the 2nd Amendment to the Forbearance Agreement changed the rate Dr. Williams paid to First Tennessee from a floating rate to a fixed rate.

63.     In August 2010, when the first payment was due under the terms of the 2nd Amendment, this represented a significant increase to 7.5%. Now, instead of paying First Tennessee a floating rate that averaged 2.47% from August 2010 to April 2014, Dr. Williams paid First Tennessee a 7.5% fixed rate that is not offset by floating rate received.

64.     Between the 7.5% fixed rate from the 2nd Amendment to the forbearance agreement and the 7.85% fixed rate from the interest rate swap, minus the 2.47% floating rate paid by the other party in the swap, Dr. Williams was paying a total of 12.88% interest rate from August of 2010 until April of 2014.

65.     Once the forbearance rate took effect, it removed the swap's ability to offset the floating rate payment to First Tennessee with a floating rate payment from the other party in the swap. The swap was not designed to offset a fixed rate payment.

66.     The November 2010 4th amendment to the forbearance agreement added an "Optional Principal Payment Increase Upon Default."

67.     Events outside of Dr. Williams' control may trigger a default. The 4th amendment now required an additional $5,000 to be deposited into the Cash Reserve Account, but does not specify how the $5,000 will be used.

68.     In March 2011, $21,500 began being deposited each week into the Cash Reserve Account. Since the 4th amendment was still in effect at this time, an alleged default of a currently unknown nature likely occurred.

69.     The $5,000 increase each week was immediately charged to the Cash Reserve Account within a day of when it was deposited.

70.    $80,000 in 16 separate $5,000 charges were made from March to June of 2010. The 5th amendment to the forbearance agreement that was responsible for changing the payment terms, occurred after the June 20th charge.

71.    The 5th amendment to the forbearance agreement required the Cash Reserve Account to be funded with $84,000 for accounting and legal expenses, in addition to $25,000 weekly payments to be allocated to various purposes including but not limited to: swap obligations, financial reporting, and bookkeeping expenses.

72.    $3,500 per week, or 14% of the $25,000, was allocated to fees that would not provide any additional security to First Tennessee interest in future principal and interest.

73.    On September 26, 2011, $30,000 in weekly deposits began being deposited in the Cash Reserve Account. Since the 5th amendment was still in effect at this time, an alleged default of a currently unknown nature likely occurred.

74.    A detailed timeline of the loans received by Dr. Williams that were placed under the forbearance agreement are as followed:

75.    On 19 January 2006, Dr. Williams received N-kredible Loan for construction of a restaurant on Ridgeway.  He would be responsible for/own only 66% of this property.  The loan was for the amount of $850,000.00 and at the time of forbearance (11 January 2010) the balance was $608,112.15.

76.    On 28 May 2006 First Tennessee Bank loan of $47,940.00 was made for a new ambulance for Alliance Healthcare, but at the time of forbearance (11 January 2010) the balance was $15,534.63.

77.    On 11 August 2006 French Quarter Group received a loan for $650,000.00 for a restaurant in Collierville, Tennessee, but at the time of forbearance (11 January 2010) the balance was $273,519.95.

78.    On 27 February 2007 Medland Loan was received for the amount of $3,000,000.00 for construction of Williams Medical Clinic, but at the time of forbearance (11 January 2010) the balance was $2,939,121.18.

79.    On 7 February 2008 a floating line of credit was established for use by Alliance Healthcare for payroll, etc. at the amount of $250,000.00.  At the time of forbearance (11 January 2010) the balance was $249,749.86.

80.    On 1 August 2008 Alliance Healthcare received a term loan of $350,000.00 which should have rolled into $250,000.00 line of credit, however it was established as a second loan. At the time of forbearance (11 January 2010) the balance for this term loan was $222,695.06.

81.    On 16 September 2008 Medland received an additional loan of $760,000.00 to complete construction of Williams Medical Clinic.  At the time of forbearance (11 January 2010) the balance was $726,840.88 (not yet termed).

82.    Dr. Williams received other loans from First Tennessee Bank during this time period, which were fully paid off.

83.    Additionally, had Dr. Williams continued paying as he was for his loans through First Tennessee Bank, all loans would have been completely paid off by the end of 2011 with the exception of the total $3,760,000.00 construction loan.  Considering this, no loans should have been placed under a forbearance agreement to begin with.

84.    First Tennessee Bank should have allowed Dr. Williams to pay off his loans by the end of 2011 and then set an amortization schedule for the remaining $3,760,000.00 construction loan.

85.    Two lines of credit were established through First Tennessee Bank by Dr. Williams: $250,000.00 in February 2008 under the name Williams Medical Clinic and $300,000.00 under the name Alliance Healthcare Systems, Inc.

86.    First Tennessee Bank used the line of credit of Alliance Healthcare to make payments to the line of credit of Williams Medical Clinic, and vice versa, without notifying Dr. Williams during the forbearance agreement.

87.    First Tennessee Bank basically traded out different accounts to make it appear to Dr. Williams as if the lines of credit were being paid off when they weren't.

88.    In January 2009 Williams Medical Clinic paid off the $300,000.00 line of credit and instructed the bank to create a new line of credit under the name Alliance Healthcare Systems, Inc. for $250,000.00 and another $100,000.00 for additional credit to cover payroll and additional fees and services First Tennessee Bank was providing.

89.    A First Tennessee representative confirmed this change with Dr. Williams through an email.  According to the representative, changes consisted of a document name change from Williams Medical Clinic to Alliance Healthcare Systems, Inc. on both lines of credit and the collateral held on the account.

90.    Dr. Williams instructed his banker at First Tennessee to close this line of credit by virtue of changing the name on this account from Williams Medical Clinic to Alliance Healthcare Systems, Inc.

91.     The $300,000.00 line of credit that was paid off in January 2009 by Dr. Williams was never actually closed.  After the forbearance agreement, First Tennessee Bank claimed he still owed for this account.

92.     In June 2011, Alliance Healthcare received $577,000.00 from Medicare due to a lawsuit settlement.

93.     First Tennessee Bank attempted to seize this $577,000.00 from Dr. Williams and put a hold on all funds to authorize allocation of funds despite all loan payments being up to date.

94.     Beginning 2 August 2010, automatic draft payments for multiple loans were drafted from Dr. Williams' new operations account by First Tennessee Bank into an escrow account.  These automatic payments occurred as followed:

95.     Beginning 2 August 2010 payments were taken out of Dr. Williams' account at $16,500/weekly ($71,500/monthly).

96.     Beginning June 2011 payments increased to $21,500/weekly ($93,167/monthly).

97.     Beginning 22 August 2011 payments increased to $25,000/weekly (108,333/monthly).

98.     1 November 2011 payments increased to $30,000/weekly ($130,000/monthly).

99.     30 December 2011 automatic payments increased to $35,000/weekly ($151,667/monthly).

100.    On 24 January 2012 several email communications were exchanged between Dr. Williams and Anita Black at First Tennessee Bank regarding Dr. Williams' concern about the unfairness of the loan acceleration and questions as to what First Tennessee Bank was using this money for.

101.     Following these conversations, payment decreased to $16,800/weekly ($72,800/monthly).

102.     During this increase in payments, First Tennessee Bank required Dr. Williams to provide additional collateral; this additional collateral consisted of a life insurance policy established for Dr. Williams' wife and children.

103.     First Tennessee Bank seized this life insurance policy from Dr. Williams.

104.     Dr. Williams negotiated a deal with First Tennessee Bank which First Tennessee Bank led Dr. Williams to believe would allow for his wife and children's policy to be released in exchange for his own personal life insurance policy.

105.     Instead, First Tennessee Bank remained in possession of both life insurance policies.  The amount of collateral this added up to (based on the value of Williams Medical Clinic, accounts held at First Tennessee, and other assets) was over $7 million.

106.     Based on calculations, at the time of the forbearance agreement Dr. Williams had a total loan value associated with First Tennessee Bank of $5.027 million.  When the loan was re-financed in November of 2014, the amount paid toward the loan was 4,989,185.60 million, yet somehow the payoff was 3.2 million in November 2014.

107.     The purpose of First Tennessee Bank placing Dr. Williams under a forbearance agreement in the first place was to help get his payments in order under a set amount of time.

108.     First Tennessee would take funds out of Dr. Williams' account making it look like payments were being made to the principal, and then hold the money in a separate account for 23 days before actually applying it to Dr. Williams' loan payments.

109.    By applying only 71% of each tremendous weekly payments he was making to his principal and interest, First Tennessee Bank allowed Dr. Williams' accounts to do the opposite.

110.    First Tennessee Bank misapplied the amount of money they were taking from Dr. Williams through the forbearance agreement so that the principal payment would remain at a higher amount, and they could attribute more money to interest.

111.    First Tennessee Bank also supplied Dr. Williams' legal counsel with a loan payment history that contained over 80 errors on April 23, 2014.

112.    Inaccurate records compound errors. Inaccurate decisions are made such as whether to classify a loan as distressed, and move it to loan rehab. Inaccurate accounting entries are then made to record a loss on the loan. Inaccurate financial statements are issued reflecting the impairment, and are not corrected quickly enough before investors make financial decisions which partly rely on inaccurate payment histories.

113.    Inaccurate records give rise to questions about oversight, risk management and quality control over the performance of loan servicing-related duties beyond those of preparing basic loan payment histories.

114.    The errors in the payment history give rise to questions about the accuracy and completeness of the date, description, amount and allocation of each payment entered on the payment history for each loan. Since payment histories were likely used when considering forbearance, it is possible that First Tennessee relied on inaccurate and incomplete evidence to conclude that loans should have been transferred to loan rehab, and, therefore, were in need of forbearance.

115.     Each of the agreements between Alliance Healthcare Systems, Inc., Williams Medical Clinic, Dr. Kenneth Williams, and First Tennessee Bank contain covenants of good faith and fair dealing implied by law.

116.     First Tennessee Bank has violated and breached the covenants of good faith and fair dealing contained in each of these agreements.

117.     The Plaintiff's legitimately expected and believed, based upon First Tennessee Bank's specific representations and its prior course of dealing with Alliance Healthcare Systems, Inc., Williams Medical Clinic, and Dr. Kenneth Williams over time that First Tennessee Bank would deal with them fairly and rationally.

118.     Although it was equally well aware of the party's course of dealing, First Tennessee Bank did not inform the Plaintiffs that it would deviate from that well-established course of dealing.

119.     As a direct and proximate result of First Tennessee Bank's breaches of the covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount in excess of $2.5 million to be proven at trial.

120.     As a result the net impact was $1.77 million in economic damages plus additional damages to be proven at trial.

121.     This factual information was gathered and verified by Marcus B. Hodge, CPA/ABV/CFF, MBA, CFE.  Summary report is attached as Exhibit A to the Complaint.

## FIRST CAUSE OF ACTION

(Illegal Contract –Fraud & Undue Influence)

122.     Plaintiffs re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 129 hereinabove.

123.    The contract creating the forbearance agreement in January of 2010 is not valid because Dr. Williams' entered into the agreement with First Tennessee under undue influence.

124.    First Tennessee used their position of power of Dr. Williams to compel him into entering an agreement to his detriment.

125.    In determining validity of a contract or conveyance that benefits the dominant party in a confidential relationship with a weaker party, the question to be answered is not whether the weaker party's decision was a good one, or even whether he knew what he was doing at the time; instead, question is whether the weaker party's decision was a free and independent one or whether it was induced by the dominant party. *Williamson v. Upchurch*, 768 S.W.2d 265, 270 (Tenn. Ct. App. 1988).

126.    By failing to disclose all of the risks and rewards of the agreement to Dr. Williams', First Tennessee's forbearance agreement is fraudulent.

127.    The elements of an action for fraudulent inducement to contract are (1) a false statement concerning a fact material to the transaction; (2) knowledge of the statements' falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; and (5) an injury resulting from the reliance. *Lamb v. Megaflight*, Inc., 26 S.W.3d 627, 630 (Tenn. Ct. App. 2000).

128.    First Tennessee caused Dr. Williams to remain ignorant to the major facets of the agreement he was entering into making the contract voidable and relievable in equity.

129.    Among the few grounds justifying rescission are fraud & undue influence. *Richards v. Taylor*, 926 S.W.2d 569, 571 (Tenn. Ct. App. 1996).

130.   As a result of the fraudulent contract entered into under undue influence, the Defendant is liable to Plaintiff for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

## SECOND CAUSE OF ACTION

(Breach of Duty of Good Faith and Fair Dealing)

131.   Plaintiffs re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 138 hereinabove.

132.   First Tennessee owed Dr. Williams a general requirement of good faith and fair dealing throughout their fiduciary relationship.

133.   Every contract imposes upon the parties a duty of good faith & fair dealing in the performance & interpretation of the contract. *Snyder v. First Tennessee Bank, N.A.,* 450 S.W.3d 515, 518 (Tenn. Ct. App. 2014).

134.   The duty of good faith and fair dealing requires a contracting party to do nothing that will have the effect of impairing or destroying he rights of the other party to receive the benefits of the contract. *Id.*

135.   First Tennessee breached this duty when they advised Dr. Williams to enter into an interest rate swap while they were betting against him to fail for their own gain.

136.   First Tennessee represented themselves as a group of trusted advisors that Dr. Williams could rely on while using him as a pawn in a game of complicated banking instruments that paid out to First Tennessee.

137.   As a result of the breach of duty of good faith and fair dealing, the Defendant is liable to Plaintiff for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

## THIRD CAUSE OF ACTION

### (Misrepresentation)

138.    Plaintiffs re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 145.

139.    Defendant fraudulently misrepresented the risks involved with the Interest Rate Swap entered into in 2006.

140.    Fraud can be intentional misrepresentation of known, material fact or it can be concealment or nondisclosure when there is duty to disclose. *Justice v. Anderson County*, 955 S.W. 2d 613, 616 (Tenn. Ct. App. 1997).

141.    Generally, a duty to disclose information arises in three situations: (1) where there is a previous definite fiduciary relation between the parties; (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other; and (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. *GuestHouse Intern., LLC v. Shoney's North America Corp.,* 330 S.W. 3d 166, 195 (Tenn. Ct. App. 2010).

142.    Defendant has a duty to disclose concealed facts due to the previous fiduciary relation with the Plaintiff, the working relationship the two had with each other that established trust and confidence between them, and the good faith required by the transaction.

143.    Plaintiff relied on these representations made by Defendant causing him great financial losses.

144.    By not disclosing the true risks of the Interest Rate Swap to Plaintiff, Defendant fraudulently misrepresented a material aspect of the transaction.

145.    As a result of their material misrepresentation, the Defendant is liable to Plaintiff for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

## FOURTH CAUSE OF ACTION

### (Negligence)

146.    Plaintiffs re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 153 hereinabove.

147.    When Defendant started paying Plaintiff's loan payments on his behalf in December 2009 they voluntarily took on a fiduciary duty to Plaintiff.

148.    One who assumes to act assumes a duty to act with reasonable care. *Messer Griersheim Indus. v. Cryotech of Kingsport, Inc.,* 45 S.W.3d 588, 604 (Tenn. Ct. App. 2001).

149.    Defendant breached their duty to Plaintiff when they began to handle Plaintiff's loan in a way that did not work for Plaintiff's benefit.

150.    By making it appear to Plaintiff that money was being taken out of his account to be applied to the principal of his loan while the money was actually placed in an intermediary account for 23 days before payment occurred, Defendant caused Plaintiff to be charged greater amounts of interest for Plaintiff's gain.

151.    As a result of their breached duty to Plaintiff, Defendant is liable for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

## FIFTH CAUSE OF ACTION

### (Wrongful Conversion)

152.    Plaintiffs re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 159 hereinabove.

153.    The elements of a conversion claim include: (1) an appropriation of another's tangible property to one's use and benefit; (2) an intentional exercise of dominion over the chattel

alleged to have been converted; and (3) defiance of the true owner's right to the chattel. *White v. Empire Exp. Inc.*, 395 S.W.3d 696, 720 (Tenn. Ct. App. 2012).

154.    By taking Plaintiff's money from his account and not immediately applying it to the principal of his loan, Defendant intentionally exercised dominion over the money for their own benefit--to make more money off of Plaintiff in interest-- against Plaintiff's right to have his loan principal paid off at the agreed upon rate.

155.    Defendant took control of Plaintiff's accounts and manipulated the payments to their own gain unbeknownst to and unauthorized by Plaintiff.

156.    As a result of their wrongful conversion of Plaintiff's assets, Defendant is liable for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

## SIXTH CAUSE OF ACTION

### (Equal Credit Opportunity Act Violation)

157.    Plaintiff's re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 164 hereinabove.

158.    The Equal Credit Opportunity Act makes it illegal to discriminate against any applicant of a credit transaction on the basis of race. 15 U.S.C.A. §1691(a)(1).

159.    The definition of "applicant" for purposes of the Equal Credit Opportunity Act can be construed as covering guarantors of credit as well. *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC.,* 754 F. 3d 380, 384 (6th Cir. 2014).

160.    Plaintiff will show at trial that Defendant discriminated against Plaintiff on the basis of race as a result of the atrocious pattern of treatment.  By forcing them into a forbearance agreement despite Plaintiff never defaulting on his loans or making a payment later than 30 days

on his loans, the evidence will show that Defendant had ulterior motives and prayed upon the Plaintiff.

161. We believe Discovery will show that as a result of Defendant's discrimination of Plaintiff on the basis of race, Defendant is liable for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

SEVENTH CAUSE OF ACTION

(Usury)

162. Plaintiffs re-allege and adopt herein by reference the allegations contained and set forth in paragraphs 1 through 169 hereinabove.

163. In Tennessee it is illegal to charge an interest rate greater than 10% per annum. T.C.A. § 47-14-103.

164. The law of the state where the bank is located governs questions of usury. *In re Crabtree*, 48 B.R. 528, 533 (Bankr. E.D. Tenn. 1985).

165. By charging Plaintiff an interest rate of 12.88%, Defendant committed usurious acts against Plaintiff.

166. As a result of this offense against Plaintiff, Defendant is liable for all consequential and extra-contractual damages, punitive damages, and attorney's fees.

RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Plaintiffs bring this action against the Defendant and demands an award of all damages, injunctive and equitable relief sought herein, including:

A. All attorney's fees and related expenses incurred by its' Counsel as a result of its case against Defendant;

B.      All damages to which Plaintiffs are entitled pursuant to the causes of action outlined herein.

C.      All extra-contractual and/or consequential damages which Plaintiffs sustained due to the breaches of contract, duty and bad faith on the part of the Defendant;

D.      Punitive damages, and in the event of an award of punitive damages, an award of attorney's fees for prosecution of this action;

E.      An award of pre-judgment interest from the original date on which the Defendant converted Plaintiff's funds to itself without applying the funds to the Plaintiff's account;

F.      An award of post-judgment interest calculated in accordance with 28 U.S.C. § 1961(a) from the date of entry of final judgment until paid;

G.      All costs of court; and,

H.      All other damages calculated in this complaint as charged herein.

I.      Punitive damages for bad faith.

J.      The Court enter an Order permanently enjoining Defendant from engaging in such practices in the future.

K.      The Court enter an Order imposing a monetary fine upon Defendant for each and every improper act committed against the Plaintiffs.

L.      Such other and additional relief as the Court may deem just and proper.

Respectfully submitted,

ALLIANCE HEALTHCARE SYSTEMS, INC.,
WILLIAMS MEDICAL CLINIC,
N-KREDIBLE FRANCHISE COMPANY LLC,
FRENCH QUARTER GROUP LLC,
AND KENNETH WILLIAMS, M.D.

BY: _____

QUENTIN WHITWELL

`     ATTORNEY FOR PLAINTIFFS

Of Counsel:

Quentin Whitwell, MSB# 10859
Gibbs Whitwell & Travis PLLC
1400 Meadowbrook Road, Suite 100
Jackson, Mississippi 39211
Office: (601)487-2640
Fax: (601)366-4295
Email: qwhitwell@gibbswhitwell.com